IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
On-Briefs May 19, 2006

## STATE OF TENNESSEE v. PHYLLIS MCCRARY, ET AL.

A Direct Appeal from the Juvenile Court for Shelby County
No. M6012     The Honorable Herbert Lane, Special Judge

No. W2005-02881-COA-R3-JV - Filed July 6, 2006

This is a termination of parental rights case. Both Mother and Father appeal from the order of the Juvenile Court of Shelby County terminating their respective parental rights. Specifically, Mother asserts that the grounds cited for termination are not supported by clear and convincing evidence in the record, and that the Department of Children's Services did not meet the statutory verification requirement. Father asserts that the grounds cited for termination of his parental rights are not supported by clear and convincing evidence in the record, and that the Department of Children's Services did not meet the statutory verification requirement. Because we find clear and convincing evidence in the record to support the Juvenile Court's findings terminating the parties' parental rights based on at least one ground under the statute, and that the Department of Children's Services did meet the statutory verification requirement, we affirm.        Phyllis McCrary ("Ms. McCrary") is the mother of the three minor children at issue in this case, A.L.M. (d.o.b. 9/18/92), D.D.M. (d.o.b. 9/4/93), and R.R.M. (d.o.b. 9/4/00). Randy Madison ("Mr. Madison", together with Ms. McCrary, "Respondents") is the father of R.R.M. (d.o.b. 9/4/00). The parental rights of the fathers of A.L.M and D.D.M. were terminated on November 10, 2005, and they are not parties to this appeal.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Curtis D. Johnson, Jr. of Memphis, Tennessee for Appellant, Randy Madison, Sr.
Mitzi H. Spell of Memphis, Tennessee for Appellant, Phyllis Mariah McCrary

Paul G. Summers, Attorney General and Reporter; Amy T. Master, Assistant Attorney General for Appellee, Tennessee Department of Children's Services

**OPINION**

On May 24, 2001, the Department of Children's Services ("DCS" or "Petitioner") filed a petition in the Juvenile Court of Memphis and Shelby County seeking the removal of the nine minor children[1] of Ms. McCrary from the home that Ms. Mc McCrary and Mr. Madison shared, including A.L.M., D.D.M., and R.R.M. The petition stated that Ms. McCrary was an admitted "crack" addict living with her nine minor children in a two-bedroom apartment, and was pregnant at the time the petition was filed. Further, the petition stated that the apartment had no utilities, there was no food in the apartment, and that the family was about to be evicted. The petition identified additional problems, such as a record of violence in the home, truancy and medical neglect that allegedly persisted, despite DCS's attempts to intervene. On May 24, 2001, the Juvenile Court entered a protective custody order, and the children were removed from the home. At a preliminary hearing on June 7, 2001, the Juvenile Court awarded temporary custody to DCS. A guardian ad litem was appointed to act on behalf of the children in the matter before the Court, and separate attorneys were appointed to represent Ms. McCrary and Mr. Madison. On July 13, 2001, the children were found to be dependent and neglected. R.R.M., was born prematurely at twenty-eight (28) weeks and suffered from numerous medical problems. The Tennessee Department of Children's Services took custody of R.R.M., and he was placed with a foster family, with whom he has remained since that time. A.L.M. and D.D.M. were placed in the custody of Yolanda Rooks, D.D.M.'s kindergarten teacher. The Juvenile Court's Order conditioned visitation by Ms. McCrary and Mr. Madison on their passing three random drug screen tests, and completing an evaluation at the Center for Children and Parents. The couple were not awarded supervised visitation until twenty-six (26) months later. In October of 2002, A.L.M and D.D.M. were returned to DCS protective custody when Ms. Rooks underwent surgery, and they were placed in foster care in January 2003.

On June 14, 2001, DCS developed the first permanency plan for R.R.M. The plan had a dual goal of returning R.R.M. to his parents or relative placement. Under the plan, Ms. McCrary was required to submit to random drug testing; obtain an alcohol and drug assessment and follow the assessment's recommendations; complete inpatient treatment for drug abuse; stop the use of alcohol and non-prescribed medications; attend medical appointments for R.R.M.; learn how to properly care for R.R.M. and his special medical needs; and learn how to create an appropriate home environment conducive to R.R.M.'s growth and development. Under R.R.M.'s permanency plan, Mr. Madison was required to submit to random drug screens; obtain an alcohol and drug assessment; attend AA and drug group sessions; and, attend anger management classes. The objective for R.R.M.'s permanency plan was for both Ms. McCrary and Mr. Madison to be able to provide a safe and nurturing environment for R.R.M. Ms. McCrary signed the plan on June 14, 2001, however, Mr. Madison did not sign the plan.

Subsequent permanency plans were developed for R.R.M. on January 9, 2002, June 12, 2002, and June 10, 2003. These plans required Ms. McCrary to attend and complete a certified parenting class; to continue to submit to random drug screens; attend Southeast Mental Health for individual and family therapy; attend R.R.M.'s medical appointments; and, continue to learn how to create an appropriate home environment conducive to R.R.M.'s growth and development. Mr.

---

[1] Only the parental rights of the three identified children, A.L.M., D.D.M., and R.R.M., are at issue on appeal.

Madison was to continue to submit to random drug screens; complete alcohol and drug treatment; attend family therapy; and, stay out of legal trouble and jail. The June 12, 2002 permanency plan, and subsequent plans, revised the objective to a dual goal of return home or adoption. Both parents signed these permanency plans, and the plans were adopted by the Juvenile Court.

DCS developed another permanency plan for R.R.M. on April 13, 2004. The goal for this plan remained a dual goal of return home or adoption. Additional requirements placed on Ms. McCrary were to obtain stable housing and establish it for a minimum of six (6) months; learn how to medically care for R.R.M.; provide proof of her ability to ensure that the basic needs of R.R.M. would be met including adequate food, shelter and clothing. In addition to previous requirements, Mr. Madison was instructed to provide and maintain adequate, stable housing; learn how to medically care for R.R.M.; and provide proof of his ability to ensure that the basic needs of R.R.M. would be met including adequate food, shelter and clothing.

DCS developed permanency plans for A.L.M. and D.D.M. on November 21, 2002, however, copies of those plans are not included in the record. Subsequent permanency plans were developed for A.L.M. and D.D.M. on April 8, 2004. These plans had the dual goals of return home or adoption. Under the plans, requirements for Ms. McCrary were to continue to submit to random drug screens; to obtain and maintain stable housing for a minimum of six (6) months; provide proof of her ability to ensure that the basic needs of the children would be met including adequate food, shelter and clothing; and, attend each scheduled visit with the children.

Pursuant to R.R.M.'s initial permanency plan, on November 27 and December 4, 2001, Ms. McCrary underwent an evaluation by the Center for Children and Parents ("CCP"). CCP recommended frequent random drug screens and intensive psychotherapy, family therapy, and parenting classes.

Ms. McCrary was referred to BabyLove, an alcohol and drug treatment program for pregnant women administered by the Midtown Mental Health Center. Ms. McCrary was admitted to the program on September 25, 2001, four months after the children were removed from her home. BabyLove offers parenting classes, educational and vocational training, and group and individual therapy. Ms. McCrary was discharged from the program on December 6, 2001, for violating the program's medication policy. Specifically, Ms. McCrary's urine screen taken on December 1, 2001, returned positive for alcohol.

Ms. McCrary was admitted to the Salvation Army's Renewal Place on April 9, 2002. This is a residential treatment program that offers alcohol and drug rehabilitation followed by educational and vocational assistance. Ms. McCrary left this program on June 4, 2002, after complaining that money had been stolen from her.

From July 2002 through June 2003, Ms. McCrary participated in outpatient programs at the Southeast Mental Health Clinic. Ms. McCrary successfully completed the eight-month Cocaine and

Alcohol Awareness Program in February 2003. During this program, she consistently tested negative for drugs.

Ms. McCrary entered Sophia's House, a shelter for abused women, on April 23, 2003. While at Sophia's House, she participated in a drug treatment program. Ms. McCrary left Sophia's House on September 6, 2003. She testified that she left because she found a job.

Ms. McCrary underwent random drug screens while her children were in the custody of DCS. She had a total of twenty-two (22) negative drug screens. However, Ms. McCrary tested positive for alcohol on October 27, 2001, and again on December 1, 2001. On April 20, 2004, Ms. McCrary tested positive for cocaine and cannabis.

Pursuant to R.R.M.'s initial permanency plan, Mr. Madison underwent an evaluation by CCP. CCP recommended frequent random drug screens, anger management treatment, therapy, and a drug rehabilitation program. Mr. Madison completed a work readiness training program on November, 8, 2001, and a parenting classes through the Exchange Club on December 14, 2001. He successfully completed an anger management class offered by Better Days, Inc., on June 17, 2002. Additionally, Mr. Madison enrolled in the New Directions intensive outpatient alcohol and drug treatment program. Up until June 10, 2003, Mr. Madison remained in compliance with the program. Mr. Madison underwent random drug screens while his child was in the custody of DCS. He had a total of ten (10) drug screens, six which showed positive results for the presence of drugs. On April 20, 2004, Mr. Madison tested positive for cocaine and cannabis.

Supervised visitation with the children was granted to both Ms. McCrary and Mr. Madison on September 24, 2003. Between September 30, 2004 and May 27, 2004, both parents had thirteen scheduled visits with the children. Of the thirteen (13) arranged visitation periods, Ms. McCrary missed three (3) visits, was present for ten (10), and was late for three of those attended. Mr. Madison missed five (5) visits, was present for eight (8), and was late for three of those eight.

On June 4, 2004, DCS petitioned the Juvenile Court to terminate the parental rights of Ms. McCrary to A.L.M., D.D.M., and R.R.M., and the parental rights of Mr. Madison to R.R.M. Though the case manager at the time, Cheryl Faulkner, signed the petition, she neglected to sign the affidavit verifying the facts alleged in the petition. DCS team coordinator Diane Hurth signed Ms. Faulkner's name in her place. The Juvenile Court granted the DCS leave to amend the petition with a new verification page on October 5, 2005.

On November 10, 2005, the Juvenile Court of Memphis and Shelby County entered a final order terminating the parental rights of Ms. McCrary and Mr. Madison to R.R.M., and terminating the parental rights of Ms. McCrary to A.L.M. and D.D.M. The termination of parental rights was based on the grounds of persistence of conditions, substantial noncompliance with the permanency plan, and abandonment. The Juvenile Court also found by clear and convincing evidence that it was in the children's best interest to terminate Ms. McCrary's and Mr. Madison's parental rights.

Ms. McCrary appeals and raises four issues for review as stated in her brief:

1. Whether the Juvenile Court erred by not dismissing the petition for termination of parental rights because DCS failed to meet the statutory requirement that it must be verified?

2. Is there clear and convincing evidence that Phyllis McCrary abandoned her children by willfully failing to visit her children during the immediate four months prior to the filing of the petition to terminate her parental rights?

3. Whether the evidence supports the Juvenile Court's finding that Ms. McCrary failed to substantially comply with the permanency plans?

4. Whether the Juvenile Court's finding that the conditions which led to removal of the children still persist is supported by clear and convincing evidence?

Mr. Madison appeals and raises three issues for review as stated in his brief:

1. Whether the Juvenile Court erred in failing to dismiss the petition for termination of parental rights due to the failure of the Department of Children's Services to verify the petition properly as required by T.C.A. § 36-1-113(d)(1)?

2. Whether the Juvenile Court erred in ruling that the Appellant Randy Madison, Sr. "failed to substantially comply with three permanency plans prepared by the Department", or in failing to rule that the goals set forth in these plans were not reasonably related to the reasons for the initial referral?

3. Whether the Juvenile Court erred in ruling that Randy Madison, Sr. "willfully abandoned" his son, R.R.M., when he in fact he had attended six of eight scheduled visits in the four months preceding the filing of the petition to terminate his parental rights?

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the Juvenile Court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. ***See*** Tenn. R. App. P. 13(d).

T.C.A. § 36-1-113(c)(2005) governs termination of parental rights and requires that such termination be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interest of the child.

-5-

The standard for the termination of parental rights is well settled. The United States Supreme Court has recognized the important nature of cases involving the termination of parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J .,* 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer,* 455 U.S. 745 (1982) (Rehnquist, J., dissenting)). Accordingly, "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.* The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *See O'Daniel v. Messier,* 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995) (rev'd on other grounds, *In re: Swanson,* 2 S.W.3d 180 (Tenn. 1999)).

As a safeguard, courts are required to apply the heightened "clear and convincing" proof standard. *See Santosky,* 455 U.S. at 769; *O'Daniel,* 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1) (2005); *State Dep't of Human Servs. v. Defriece,* 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996). Although it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier,* 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995); *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn.1992); *O'Daniel,* 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel,* 905 S.W.2d at 188; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer,* 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts,* 622 S.W.2d 438, 441 (Tenn. Ct. App. 1981); *Brandon,* 838 S.W.2d at 536.

### I. Failure of DCS to Verify Petition

Ms. McCrary and Mr. Madison both assert that the Juvenile Court erred in failing to dismiss the petition for termination of parental rights due to the failure of DCS to verify the petition properly as required by T.C.A. § 36-1-113(d)(1). The pertinent part of the statute states that "[t]he petition, or allegations in the adoption petition, to terminate parental rights may be made upon information and belief and shall be verified." DCS filed its petition to terminate Ms. McCrary and Mr. Madison's parental rights on June 4, 2004. DCS case manager Cheryl Faulkner signed the petition, however, she neglected to sign the affidavit verifying the facts alleged in the petition. DCS team coordinator Diane Hurth signed Ms. Faulkner's name in her place. On October 5, 2005, during the trial, the Juvenile Court granted DCS permission to amend the petition with a new verification page signed by DCS case manager Mr. Guy. Both Ms. McCrary and Mr. Madison contend that the

Juvenile Court erred when it allowed DCS leave to amend its petition, and that the petition should have been dismissed at that time.

This Court reviews a trial court's ruling on a motion to amend under an abuse of discretion standard. *Merriman v. Smith,* 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 28 L.Ed.2d 77, 91 S.Ct. 795 (1971)). A trial court's discretionary decision will be set aside only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence. *White v. Vanderbilt Univ.,* 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999) (citing *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999)). When reviewing a trial court's discretionary decision, we begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision. *Overstreet,* 4. S.W.3d at 709.

Tenn. R. Civ. P. 15.01 states:

> A party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been set for trial, the party may so amend it at any time within 15 days after it is served. Otherwise a party may amend the party's pleadings only by written consent of the adverse party or by leave of court; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 15 days after service of the amended pleading, whichever period may be longer, unless the court otherwise orders.

Tenn. R. Civ. P. 15.01. Under the provisions of Rule 15.01, at the time DCS sought to amend their petition, they could do so "only by written consent of the adverse party or by leave of court." The rule further provides that such "leave shall be freely given when justice so requires."
In *Branch v. Warren*, the Tennessee Supreme Court emphasized the liberality of this rule where amendments are sought. Rule 15 "needs no construction, it means precisely what it says, that 'leave shall be freely given.' " *Branch v. Warren,* 527 S.W.2d 89, 92 (Tenn. 1975). Cases since *Branch v. Warren* have emphasized the liberality with which trial courts should approach the question of whether a motion to amend should be granted. *See, e.g., Craven v. Lawson,* 534 S.W.2d 653, 655 (Tenn. 1976); *Walden v. Wylie,* 645 S.W.2d 247, 250 (Tenn. Ct. App. 1982); *Douglass v. Rowland,* 540 S.W.2d 252, 256 (Tenn. Ct. App. 1976); *see also Merriman,* 599 S.W.2d at 559; *cf. Liberty Mutual Insurance Co. v. Taylor,* 590 S.W.2d 920, 921 (Tenn. 1979). The amendment in the instant case was necessary to bring before the Juvenile Court the issue of the welfare of the three minor children in this case. The Respondents' rights were not prejudiced. We find no abuse of discretion on the part of the Juvenile Court in allowing the amendment. Although T.C.A. § 36-1-113(d)(1)

mandates that the petition to terminate parental rights shall be verified, we find nothing in the language of the statute that would prohibit a trial court from permitting a party to amend their petition in order to comply with the requirements of the statute.

## II. *Grounds for Termination*

Any one of the nine statutory grounds for termination of parental rights listed in T.C.A. § 36-1-113(g) is sufficient to support an order terminating parental rights where termination is in the best interests of the child. ***In re D.L.B.,*** 118 S.W.3d 360, 367 (Tenn. 2003). The Juvenile Court relied on three of the statutory grounds in terminating Ms. McCrary and Mr. Madison's parental rights: (1) abandonment; (2) substantial noncompliance with the permanency plan, and (3) persistence of conditions. T.C.A. § 36-1- 113(g)(1), (2), (3). We have reviewed the entire record in this case and we find that the record is replete with evidence to support the Juvenile Court's finding that termination of Ms. McCrary and Mr. Madison's parental rights is warranted on at least one of the grounds listed in the Juvenile Court's final order.

### A. *Abandonment*

Although the DCS has waived the issue in its brief for failure of the trial court to make specific findings of fact, we will briefly address this issue. The Juvenile Court found that Ms. McCrary and Mr. Madison willfully abandoned their children. The Juvenile Court's Order, relating to abandonment, states:

> Respondents have willfully abandoned said children, in that for four (4) consecutive months preceding the filing of this petition, the Respondents have failed to visit (or has only engaged in token visitation). Respondents either cancelled visits, appeared 30 minutes to an hour late, or did not show up for several visits.

T.C.A. § 36-1-113(g)(1) states that the initiation of termination of parental rights may be based upon abandonment by the parent as defined in T.C.A. § 36-1-102. The statute defines "abandonment" as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make

T. C. A. § 36-1-102 (1)(A)(I). The statute defines "willfully failed to visit" as:

> For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit

or engage in more than token visitation.

T. C. A. § 36-1-102 (1)(E). The statute defines "token visitation" as:

> For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child.

T. C. A. § 36-1-102 (1)(C).

The petition to terminate Ms. McCrary and Mr. Madison's parental rights was filed on June 4, 2004. Only a parent's conduct in the four months immediately preceding the filing of a termination petition then before the court may be used as grounds to terminate parental rights. *In re D.L.B.,* 118 S.W.3d 360, 366 (Tenn. 2003). The relevant four-month period to determine abandonment includes the months of February, March, April and May 2004. During this four-month period, the Respondents were only allowed supervised visits with the children. Beginning on January 8, 2004, Respondents had scheduled visitation for two hours every other Thursday. Between February 4 and June 4, 2004, DCS had scheduled eight supervised visits for the Respondents with their children. Both Ms. McCrary and Mr. Madison attended six of the eight visits, and were between thirty (30) and sixty (60) minutes late for two of the visits attended.

The Petitioner argues that DCS had provided both parents with calendars of the scheduled visits, and any failure to visit was willful on the part of the Respondents. The Respondents argue that there is no clear and convincing evidence to support the finding of the Juvenile Court that they failed to visit, or engaged in only token visitation. We agree with the Respondents.

In a termination of parental rights case, the element of willfulness is central to the determination of abandonment. *In re Swanson,* 2 S.W.3d 180, 188 (Tenn.1999). Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *In re Audrey S.,* 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). Respondents were limited to supervised visits with the children once every two weeks. Respondents attended six of the eight visits during the relevant four-month period. "Token visitation" means that the visitation, "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." T.C.A. § 36-1-102(1)(C)(1) (2005). While the visits were infrequent (twice monthly) and were of short duration (two hours), these constraints were determined for the Respondents. Under the circumstances of this case, we find that the scheduled visits cannot be defined as token. The Respondents took advantage of most (75%) of the time allotted to visit the children. From the record before us, we cannot conclude, by clear and convincing evidence, that the Respondents willfully abandoned their children, and that their parental rights should be terminated

on that ground. However, since T.C.A. § 36-1- 113(c) allows for termination of parental rights if any one of the grounds outlined in T.C.A. § 36-1-113(g) is found by clear and convincing evidence, we will next address whether there is clear and convincing evidence to support termination on the ground of substantial noncompliance or persistence of conditions.

**B. *Substantial Noncompliance with the Permanency Plan*[2]**

T.C.A. § 37-2-403 outlines the requirements of any permanency plan and the consequences of substantial noncompliance by a parent, and reads, in pertinent part, as follows:

> (2)(A) The permanency plan for any child in foster care shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency. Such statements shall include the responsibilities of each party in specific terms and shall be reasonably related to the achievement of the goal specified in subdivision (a)(1).
>
>           \*        \*        \*
>
> (C) Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

T. C. A. § 37-2-403. As discussed by this Court in ***In re M.J.B.,*** 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn.Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn.Code Ann. § 36-1- 113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, ***In re Valentine,*** 79 S.W.3d at 547; ***In re L.J.C.,*** 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the

---

[2] The petition for termination did not allege this ground for termination of the parental rights of the Respondents; however, proof was introduced in the trial court, and this issue was in fact tried by the trial court. Pursuant to Tenn. R. Civ. P. 15.02, we will consider the petition amended to include this ground for termination.

particular requirement that has not been met. ***In re Valentine,*** 79 S.W.3d at 548-49. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. ***In re Valentine,*** 79 S.W.3d at 548.

***In re M.J.B.,*** 140 S.W.3d at 654. Furthermore, for purposes of terminating parental rights based on noncompliance with a requirement under a permanency plan, the real worth and importance of a parent's noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement. ***In re Valentine,*** 79 S.W.3d 539, 548 (Tenn. 2002). Substantial noncompliance is a question of law which we review *de novo* with no presumption of correctness. ***In re Valentine,*** 79 S.W.3d at 548 -549.

### 1. Ms. McCrary

The Juvenile Court held that pursuant to T.C.A. § 36-1-113(g)(2), Ms. McCrary had failed to substantially comply with permanency plans prepared by DCS. The court found that Ms. McCrary signed the numerous permanency plans and that the Juvenile Court had ratified all the plans. The court further found that the goals and objectives set out in the plans were necessary for reunification of the parents with the children, and were reasonable and related to reasons that necessitated foster care. The court specifically identified Ms. McCrary's noncompliance as her inability to quit doing drugs, despite having attended four different treatment programs, and her inability to obtain suitable housing.

The permanency plans developed for R.R.M. required that Ms. McCrary submit to random drug testing; obtain an alcohol and drug assessment and follow the assessment's recommendations; complete inpatient treatment; stop the use of alcohol and non-prescribed medications; attend medical appointments for R.R.M.; learn how to properly care for R.R.M. and his special medical needs; and to learn how to create an appropriate home environment conducive to R.R.M.'s growth and development. Subsequent permanency plans required that she also attend and complete a certified parenting class; attend Southeast Mental Health for individual and family therapy; obtain stable housing and establish it for a minimum of six (6) months; provide proof of her ability to ensure that the basic needs of R.R.M. would be met including adequate food, shelter and clothing. As to A.L.M. and D.D.M., the permanency plans developed for them required that Ms. McCrary submit to random drug screens; obtain and maintain stable housing for a minimum of six (6) months; provide proof of her ability to ensure that the basic needs of the children would be met including adequate food, shelter and clothing; and, attend each scheduled visit with the children. We concur with the Juvenile Court's finding that the permanency plans' requirements were reasonable and related to remedying the conditions that caused the children to be removed from Ms. McCrary's custody, given that those conditions included R.R.M.'s health problems, Ms. McCrary's drug use, a home without utilities or food, medical neglect, and truancy.

Ms. McCrary made notable attempts to comply with the permanency plans; however, she has failed to comply with the plans' most important requirements, which would insure the safety and

welfare of her children. She received an evaluation by CCP, which recommended frequent random drug screens and intensive psychotherapy, family therapy, and parenting classes. Ms. McCrary attended parenting classes and psychotherapy. Ms. McCrary attended multiple rehabilitation and counseling programs with varying degrees of success including BabyLove, Renewal Place, Sophia's House and Southeast Mental Health Clinic. She tested negative on a majority of her drug tests. While Ms. McCrary did not attend medical appointments for R.R.M., DCS admitted that she was never informed of such appointments. Despite complying with many aspects of the permanency plans, Ms. McCrary tested positive for cocaine and cannabis as late as April 20, 2004. Additionally, Ms. McCrary's mother testified at trial that she was still using drugs. From the time the children were removed from her home, Ms. McCrary had not obtained suitable housing for herself and her family. She stayed with relatives, lived in shelters and inpatient treatment facilities, been homeless, and at the time of trial was living in a boarding house. Of the requirements entitled to significant weight - refraining from drugs and alcohol, maintaining stable housing for a minimum of six (6) months, and providing proof of her ability to ensure that the basic needs of the children would be met including adequate food, shelter and clothing – Ms. McCrary has not complied with any of them. Based on our independent review of the record, we have determined that the record contains clear and convincing evidence that Ms. McCrary has been unable to comply substantially with her obligations under these plans. Accordingly, we affirm the Juvenile Court's conclusion that the DCS has carried its burden of proof for terminating Ms. McCrary's parental rights under T.C.A. § 36-1-113(g)(2).

### 2. *Mr. Madison*

The Juvenile Court held that pursuant to T.C.A. § 36-1-113(g)(2), Mr. Madison had failed to substantially comply with permanency plans prepared by DCS for R.R.M. The court found that Mr. Madison signed three of the permanency plans and that the Juvenile Court had ratified all the plans. The court further found that the goals and objectives set out in the plans were necessary for reunification of the parents with the children, and were reasonable and related to reasons that necessitated foster care. The court specifically identified Mr. Madison's noncompliance as his inability to quit doing drugs, and his inability to obtain suitable housing.

Under R.R.M.'s permanency plan, Mr. Madison was required to submit to random drug screens; obtain an alcohol and drug assessment; attend AA and drug group sessions; and, attend anger management classes. The objective for R.R.M.'s permanency plan was for Mr. Madison to be able to provide a safe and nurturing environment for R.R.M. Subsequent permanency plans were developed for R.R.M., which required that Mr. Madison attend family therapy; stay out of legal trouble and jail; obtain and maintain adequate, stable housing for a minimum of six (6) months; and, attend each scheduled visit with his son; learn how to medically care for R.R.M.; and provide proof of his ability to ensure that the basic needs of R.R.M. would be met including adequate food, shelter and clothing.

Mr. Madison argues that the Juvenile Court erred when it neglected to find that the requirements of the permanency plan were "reasonable and related to remedying the conditions

which necessitate foster care placement" as dictated by T.C.A. § 36-2-403(a)(2)(C). However, Mr. Madison is in error in his assertion, because the Juvenile Court's Order dated November 10, 2005, specifically states that "[t]he goals and objectives were necessary for reunification of the parents with the children, and are reasonable and related to reasons that necessitated foster care."

In the alternative, Mr. Madison argues that the goals and objectives set forth in the permanency plans for R.R.M. were not reasonably related to the reasons for the initial referral. We concur with the Juvenile Court's finding that the requirements set out in the permanency plans developed for R.R.M. were reasonable and related to remedying the conditions that caused R.R.M. to be removed from Mr. Madison's custody, given that those conditions included R.R.M.'s health problems, Mr. Madison's drug use, a home without utilities or food, and a record of violence in the home, medical neglect and truancy.

Mr. Madison made significant attempts to comply with the permanency plans; however, like Ms. McCrary, he has failed to comply with the most important requirements – those that would insure the safety and welfare of his son. Mr. Madison received an evaluation by CCP, which recommended frequent random drug screens, participation in and completion of an anger management program, psychotherapy, and drug rehabilitation. Mr. Madison completed a work readiness training program, parenting classes, and an anger management program. Additionally, Mr. Madison enrolled in an outpatient alcohol and drug treatment program, and remained out of jail. Mr. Madison underwent ten (10) random drug screens while his child was in the custody of DCS, six (6) of which showed positive results for the presence of illegal drugs.

Mr. Madison argues, that he had complied with all of the written terms of the permanency plans developed for R.R.M. Mr. Madison asserts that the permanency plans had no written requirement "in black and white" that he pass all the drug screens, only that he submit to them. Further, Mr. Madison argues that he "cannot be held to a standard which requires him to comply with unwritten terms of compliance for permanency plans which have never been communicated to him," and to do so would be "manifestly unfair and should not be tolerated as a condition for the return of his child." We find Mr. Madison's argument to be tenuous, at best. While it is true that the permanency plans only state that Mr. Madison submit to the drug screens, the very clear objective of said test was to insure that Mr. Madison refrain from the use of illegal drugs and alcohol. This issue is wholly without merit.

Despite complying with many aspects of the permanency plans, of the requirements entitled to significant weight - refraining from drugs and alcohol, maintaining stable housing for a minimum of six (6) months, and providing proof of his ability to ensure that the basic needs of his child would be met including adequate food, shelter and clothing – Mr. Madison has not complied with any of them. He tested positive for cocaine, and at trial he admitted to the regular use of marijuana. At trial Mr. Madison testified that he was living in his car, or in the alternative, with Ms. McCrary in the boarding house, and he was unemployed. Based on our independent review of the record, we have determined that the record contains clear and convincing evidence that Mr. Madison has been unable

to comply substantially with his obligations under these plans. Accordingly, we affirm the Juvenile Court's conclusion that the DCS has carried its burden of proof for terminating Mr. Madison's parental rights under T.C.A. § 36-1- 113(g)(2).

### C. Persistence of Conditions

Ms. McCrary takes issue with the Juvenile Court's conclusion that her parental rights should be terminated because she failed to remedy the conditions that caused DCS to remove the children from her home, and because there is little likelihood that she will remedy those conditions in the near future.[3] The elements of the "persistence of conditions" ground for termination of parental rights are defined in T.C.A. § 36-1-113(g)(3)(A) as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (I) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

A biological parent's parental rights cannot be terminated pursuant to T.C.A. § 36-1-113(g)(3)(A) unless the Department presents clear and convincing evidence establishing each of the statutory elements. *In re Valentine,* 79 S.W.3d at 550.

It is undisputed that the children have been in DCS custody since May 2001, at the time of trial a period of more than three years. The conditions that led to A.L.M., D.D.M., and R.R.M. being removed from Ms. McCrary's custody included her drug addiction, the lack of suitable housing, and medical neglect. Ms. McCrary attended four different drug and alcohol rehabilitation programs, but as late as April 20, 2004, Ms. McCrary tested positive for cocaine and cannabis. Additionally, Ms. McCrary's mother testified at trial that her daughter was still using drugs. Since the time the children were removed from her custody, Ms. McCrary has lived with relatives, lived in shelters, inpatient treatment facilities, been homeless, and at the time of trial was living in one room of a boarding house. A Court Appointed Special Advocate (CASA) representative conducted a home study for the Juvenile Court prior to trial, and in reference to her living conditions stated:

---

[3] Mr. Madison does not present an issue of the Juvenile Court's decision terminating his parental rights based on persistence of conditions.

> Ms. McCrary is living in a boarding house . . . with her three-year-old daughter. There are additionally three other people that dwell in the house. Ms. McCrary does not know the full names of these individuals. Because there is little known about the character of these tenants such as their criminal background, this CASA is concerned about the safety of any children residing in this house. In addition, Ms. McCrary shares an already crowded room with her daughter. These living arrangements are not conducive to another child. . . . During the visit with Ms. McCrary, this CASA observed a dirty living area. The beds in the room had dirty linen and had not been made. The living space is quite small and it does not appear that this room is conducive to a mother and two children.

One of the issues of great concern has always been Ms. McCrary's willingness and ability to care for R.R.M. and his special medical needs. Ms. McCrary attended parenting classes and therapy to assist her in this area. However, when the CASA representative visited Ms. McCrary a few months before trial, he discovered that her three-year-old daughter was missing all of her top teeth. Ms. McCrary stated that the child's teeth "had just disintegrated."

Ms. McCrary has consistently demonstrated an inability to remedy the conditions that have undermined her children's welfare. Most of the significant problems reported by DCS in 2001, a lack of suitable housing, evidence of drug abuse and medical neglect, still existed at the time of the hearing on DCS's termination petition in November 2005.

Finally, we find that there was clear and convincing evidence presented that continuation of Ms. McCrary's relationship with the children greatly diminishes the children's chances of integration into a safe, stable and permanent home. R.R.M. has been living with a foster family, the Hendersons, since he entered DCS custody five (5) years ago. There was evidence presented that he appeared to be thriving in this environment. Furthermore, the Hendersons have indicated an interest in adopting R.R.M. if the Court affirms the termination of Mother's parental rights. A.L.M. and D.D.M. have a cousin, Connie Nelson, attending adoption preparation classes so that she might adopt both of these children.

Accordingly, we find that the record contains clear and convincing evidence that Ms. McCrary has failed to remedy the conditions that led to the children's removal, and, given the amount of time she has had to accomplish these goals, that there is little likelihood that she will be able to remedy these conditions at an early date. Based on these findings, we have determined that the Juvenile Court properly found that grounds existed under T.C.A.. § 36-1-113(g)(3)(A) to terminate Ms. McCrary's parental rights.

The Juvenile Court held that termination of Ms. McCrary's parental rights as to A.L.M., D.D.M., and R.R.M., and Mr. Madison's parental rights to R.R.M., was in the best interest of the children pursuant to T.C.A. § 36-1-113(i). Neither Ms. McCrary, nor Mr. Madison, contested this issue on appeal, but our review of the record confirms that the trial court found clear and convincing evidence that termination is in the children's best interest..

For the foregoing reasons, we reverse the order of the trial court terminating the parental rights of Respondents on the ground of abandonment.  The order of the trial court terminating the parental rights of Respondents in all other respects is affirmed.  Costs of this appeal are assessed one-half to Appellant Phyllis McCrary, and one-half to Randy Madison, and their respective sureties.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.